# In the United States Court of Federal Claims
**OFFICE OF SPECIAL MASTERS**
No. 18-0100V
UNPUBLISHED

| | |
|---|---|
| CYNTHIA PRICE TAYLOR,<br><br>      Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>      Respondent. | Chief Special Master Corcoran<br><br>Filed: March 12, 2021<br><br>Special Processing Unit (SPU); Decision Awarding Damages; Pain and Suffering; Lost Wages; Influenza (Flu) Vaccine; Guillain-Barré Syndrome (GBS) |

*Ronald Craig Homer*, Conway, Homer, P.C., Boston, MA, for Petitioner.

*Amanda Pasciuto*, U.S. Department of Justice, Washington, DC, for Respondent.[1]

## DECISION AWARDING DAMAGES[2]

On January 22, 2018, Cynthia Price Taylor filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq*.[3] (the "Vaccine Act"). Petitioner alleged that she suffered Guillain‑Barré syndrome (GBS) after receiving the influenza ("flu") vaccine on October 25, 2015. Petition at 1, ¶ 2. The case was assigned to the Special Processing Unit ("SPU") of the Office of Special Masters. After Respondent conceded entitlement, the parties were unable to resolve damages on their own, so the disputed damages components were addressed at the February 2021 SPU Motions Day.

For the reasons set forth below, I find that Petitioner is entitled to an award of damages in the amount **$166,281.56, representing $160,000.00 for her past pain and**

---

[1] Ms. Pasciuto substituted at hearing for Respondent's counsel of record, Jennifer Reynaud.

[2] Because this Decision contains a reasoned explanation for the action in this case, I am required to post it on the United States Court of Federal Claims' website in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[3] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755.

**suffering and $6,281.56 for her past out-of-pocket expenses.** Petitioner is not, however, entitled to compensation for any lost wages.

## I.     Relevant Procedural History

Approximately sixteen months after the Petition was filed in this case, Respondent filed a Rule 4(c) Report conceding that Petitioner's injury met the Table definition for GBS following receipt of the seasonal flu vaccine. ECF No. 35; *see* 42 C.F.R. § 100.3(a) XIV.D. (2017) (definition of a Table GBS). I issued a Ruling on Entitlement on May 31, 2019. ECF No. 36. The parties thereafter made some efforts to settle damages but were unsuccessful. Both sides eventually agreed to my proposal that they participate in an expedited hearing, completing damages briefing by January 6, 2021. ECF No. 36 (joint status report); ECF Nos. 64, 69-70 (parties' briefs). The expedited hearing was held on February 26, 2021,[4] and at its conclusion I orally informed the parties of my determination.

## II.    Legal Standard

Compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." Section 15(a)(4). Additionally, a petitioner may recover "actual unreimbursable expenses incurred before the date of judgment award such expenses which (i) resulted from the vaccine-related injury for which petitioner seeks compensation, (ii) were incurred by or on behalf of the person who suffered such injury, and (iii) were for diagnosis, medical or other remedial care, rehabilitation . . . determined to be reasonably necessary." Section 15(a)(1)(B). The petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Human Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996).

There is no mathematic formula for assigning a monetary value to a person's pain and suffering and emotional distress. *I.D. v. Sec'y of Health & Human Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) ("[a]wards for emotional distress are inherently subjective and cannot be determined by using a mathematical formula"); *Stansfield v. Sec'y of Health & Human Servs.*, No. 93-0172V, 1996 WL 300594, at *3 (Fed. Cl. Spec. Mstr. May 22, 1996) ("the assessment of pain and

---

[4] The expedited hearing in this case was originally scheduled for January 15, 2021, but was rescheduled due to expected unrest in downtown Washington, D.C. around that time. ECF No. 37; Informal Remark and Non-pdf Pre-Hearing Order, issued Jan. 13, 2021. An official recording of the proceeding was taken by court reporter, and a link to instructions on the court's website detailing how to order a certified transcript or audio recording of the proceeding can be found in the minute entries for this proceeding. Minute Entry, dated February 26, 2021; *see also* www.uscfc.uscourts.gov/trans (last visited June 1, 2020).

suffering is inherently a subjective evaluation"). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering. *I.D.*, 2013 WL 2448125, at *9 (quoting *McAllister v. Sec'y of Health & Human Servs.,* No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

I may also consider prior pain and suffering awards to aid my resolution of the appropriate amount of compensation for pain and suffering in this case. *See, e.g.*, *Doe 34 v. Sec'y of Health & Human Servs.*, 87 Fed. Cl. 758, 768 (2009) (finding that "there is nothing improper in the chief special master's decision to refer to damages for pain and suffering awarded in other cases as an aid in determining the proper amount of damages in this case."). And, of course, I may rely on my own experience (along with my predecessor Chief Special Masters) adjudicating similar claims.[5] *Hodges v. Sec'y of Health & Human Servs.*, 9 F.3d 958, 961 (Fed. Cir. 1993) (noting that Congress contemplated the special masters would use their accumulated expertise in the field of vaccine injuries to judge the merits of individual claims).

### III.     The Parties' Arguments

In her damages brief, Petitioner requested $6,331.45 for her out-of-pocket expenses, $240,900.00 for three years of past lost wages, $80,300.00 for one year of future lost wages, and $215,000.00 for her past and future pain and suffering.[6] Petitioner's Memorandum in Support of Damages ("Mem.") at 21, 25, 28, ECF No. 64. The list of out-of-pocket expenses includes mileage, co-pays from medical appointments, rehabilitation, and physical therapy ("PT"), a gym membership purchased in January 2018, and sessions with a personnel training from January through December 2018. Mem., Tab A: Supporting Documentation, ECF No. 64-1.

To support the amount requested for lost wages, Petitioner provided an affidavit from her husband; letters from her colleague, Dr. Harry S. White, and her trainer, Alisa Conway; W-2s from 2012 through 2017; and her 2018 statement of her social security

---

[5] From July 2014 until September 2015, the SPU was overseen by former Chief Special Master Vowell. For the next four years, until September 30, 2019, all SPU cases, including the majority of GBS claims, were assigned to former Chief Special Master Dorsey. In early October 2019, the majority of SPU cases were reassigned to me as the current Chief Special Master.

[6] Petitioner did not specify the portion of this amount which would be attributed to the future component. Any amount awarded for future pain and suffering must be reduced to its net present value. Section 12(f)(4)(A).

3

benefits. Mem. at 22-23[7] (citing Exhibits 26-27, her husband's affidavit and Dr. White's letter, respectively), ECF No. 58; Mem. Tab B: Lost Wages Documentation, ECF No. 58-2. As the Clinic Director of the Brookline Community Mental Health Center, Dr. White worked closely with Petitioner, who was the Executive Director, for 33 years. Exhibit 27 at 1. Petitioner also relied on assertions in her third affidavit, filed on May 11, 2018. Mem. at 22-23; *see* Exhibit 20, ECF No. 14.

Petitioner's lost wage claim was based on changes in her personal plans for retirement that she alleged were imposed on her by her GBS injury. Although she had planned to work for six additional years, until 2023 when her daughter would graduate from college, Petitioner limited her request to three years of past lost wages for the period from her retirement in November 2017 until November 2020, plus one year of future lost wages for the single year thereafter. Mem. at 22-25; Exhibit 20 at 1. In November 2021, Petitioner will be 70 years old, which she argued would be her work life expectancy under the relevant legal standards. Mem. at 24-25; *see, e.g.,* Exhibit 2 at 2 (indicating Petitioner's birthdate of March 3, 1951). Regarding the amount she seeks for her pain and suffering, Petitioner stressed that the total amount of time she was hospitalized and participating in inpatient rehabilitation was much longer than that of petitioners in cases like *Johnson, Dillenbeck, Fedewa, Presley,* and *Devlin*, all of whom received pain and suffering awards close to $180,000.00.[8] Mem. at 26-28.

Respondent countered that Petitioner should receive the lesser amount of $127,900.00 for total pain and suffering,[9] plus $3,815.70 her past out-of-pocket expenses. Respondent's Memorandum in Support of Damages ("Opp.") at 1, ECF No. 69. To support this lower amount, Respondent stressed the significant improvement Petitioner exhibited two and three months after onset, along with medical record entries indicating a lack of symptoms seven months after onset. *Id.* at 7-8. Characterizing Petitioner's claims of significant ongoing symptoms as unsupported, Respondent maintains "[P]etitioner is not entitled to an award for lost wages." *Id.* at 10. And regarding Petitioner's past out-of-pocket expenses, Respondent objects to the inclusion of mileage and co-pays

---

[7] Although one citation to Dr. White's letter was to Exhibit 25, this is a simple error. *See* Pet. Mem. at 23. The citation clearly should be to Exhibit 27.

[8] In four of these cases, $180,000.00 was the exact sum awarded for actual pain and suffering. *Fedewa v. Sec'y of Health & Human Servs.,* No.17-1808V, 2020 WL 1915138 (Fed. Cl. Spec. Mstr. Mar. 26, 2020); *Johnson v. Sec'y of Health & Human Servs.,* No. 16-1356V, 2018 WL 5024012 (Fed. Cl. Spec. Mstr. July 20, 2018); *Presley v. Sec'y of Health & Human Servs.,* No. 17-1888V, 2020 WL 1898856 (Fed. Cl. Spec. Mstr. Mar. 23, 2020); *Devlin v. Sec'y of Health & Human Servs.,* No. 19-0191V, 2020 WL 5512505 (Fed. Cl. Spec. Mstr. Aug. 7, 2020). In *Dillenbeck,* I awarded $170,000.00 for past pain and suffering and $10,857.15, the net present value of payments of $5,000.00 per year for 22 years. *Dillenbeck v. Sec'y of Health & Human Servs.,* No. 17-0428V, 2019 WL 4072069 (Fed. Cl. Spec. Mstr. July 29, 2019).

[9] Like Petitioner, Respondent does not distinguish between past and future amounts. *See supra* note 6.

related to treatment of Petitioner's knee pain in the fall of 2016 and the costs of her gym membership and sessions with a trainer in 2018. Opp., Appendix A at 2, ECF No. 69-1.

On January 6, 2021, Petitioner filed a reply brief in which she addressed the arguments made by Respondent. Petitioner's Reply to Opp. ("Reply") ECF No. 70. Petitioner again stressed the length of her hospitalization and inpatient rehabilitation. *Id.* at 5-7. She revised the amount she is requesting for her past out-of-pocket expenses to remove the amounts related to treatment of her knee pain. *Id.* at 7. Petitioner's revised amount for her expenses is $6,281.56. *Id.*

### IV.     Medical History

The medical records reveal that prior to her GBS in late 2015, Petitioner experienced several episodes of vertigo in late 2012 and 2013.[10] She was characterized as obese and suffered significant knee pain both prior to and after the onset of her GBS. Exhibit 2 at 74; Exhibit 4.

As often happens with GBS, Petitioner sought treatment on several occasions before being diagnosed, since identifying the precise nature of her illness was difficult. Exhibits 2 at 49-52 (November 11, 2015 PCP visit), 48 (November 12, 2015 call to PCP), and 42-45 (November 12, 2015 urgent care visit). However, these visits occurred over a short period of time – and within three days of her first complaint, Petitioner was hospitalized with a diagnosis of probable GBS. Exhibit 6 at 22, 41. She reported falls both prior to and during her hospitalization and developed incontinence which required catherization. Exhibit 6 at 22, 38. After receiving a five-day course of IVIG, Petitioner was transferred to another facility for inpatient rehabilitation on November 25, 2015. Exhibit 6 at 38; Exhibit 10 at 22.

When assessed at the inpatient rehabilitation facility, it was noted that Petitioner continued to need a catheter, that her pain (rated at a level of six out of ten) was being controlled with morphine every four hours, and that her Neurontin had been increased to 600 milligrams. Exhibit 10 at 9-10. While inpatient rehabilitation was needed, Petitioner's "prognosis for significant practical improvement within a reasonable period of time appear[ed] excellent." *Id.* at 12.

Over the subsequent 35-day period of inpatient hospitalization, Petitioner's symptoms improved, and her incontinency resolved. When discharged home on

---

[10] Petitioner was treated for dizziness and nausea in November 2012. Exhibit 2 at 108. During treatment for an episode of vertigo in June 2013, Petitioner reported an earlier episode of severe dizziness two months prior. Exhibit 2 at 103-04.

December 30, 2015, she was voiding without a catheter, was using a rolling walker, and was instructed to continued taking morphine and Lyrica. Exhibit 10 at 3-4. Seen by her PCP on January 5, 2016, Petitioner was still taking Lyrica but assessed her strength at 85 percent. Exhibit 2 at 30. In early February 2016, her neurologist ordered another EMG which showed clear clinical improvement. Exhibit 16 at 9-10; Exhibit 6 at 1 (results of EMG).[11]

From January 13 through March 3, 2016, Petitioner underwent eleven PT sessions physical therapy. Exhibit 9 at 1-20. At her session on February 23, 2016, Petitioner reported that all pain had resolved except the "nerve pain in [her] feet," which she rated as two out of ten, and that she continued to take Lyrica. *Id.* at 17. Her strength was assessed as five out of five. *Id.* When discharged from PT on March 3, 2016, Petitioner had met all PT goals. *Id.* at 15.

Several months later, when seen again by her neurologist on June 23, 2016, Petitioner reported that she was taking Lyrica at a reduced rate and felt 90 percent improved with better balance and normal leg strength. Exhibit 16 at 32. The neurologist noted that Petitioner's examination was "completely normal" and thought it "highly unlikely that she will get a reoccurrence." *Id.* at 32. A later record indicated Petitioner ceased taking Lyrica around this time. Exhibit 15 at 29 (March 3, 2017 visit to the podiatrist, discussed in next paragraph).

For the remainder of 2016, Petitioner received treatment on several occasions for illness and knee pain. Exhibit 2 at 2-24, 123-24; Exhibits 3, 5, 11. Petitioner did not, however, complain of any symptoms which would be related to her GBS during the second half of 2016, or first few months in 2017 for that matter. On March 3, 2017, she visited a podiatrist complaining of calluses, issues with her toenails, and numbness in her feet. Exhibit 15 at 29. The podiatrist recommended lotion for her calluses and better fitting shoes to avoid numbness in her big toes. He opined that her "neuropathy appears to have almost completely resolved." *Id.* at 32.

Despite being treated for other illnesses throughout the remainder of 2017 and 2018, Petitioner did not complain of symptoms which could be linked to her GBS until more than two years later, in August 2019. Exhibit 25 at 11. The medical record from that visit reveals that Petitioner reported an earlier recovery from her GBS and return of symptoms only three months ago, in May 2019. *Id.* When she complained of these symptoms during a visit to her neurologist approximately three weeks later, he opined that her symptoms could be due to restless leg syndrome. Exhibit 24 at 10 (September 6, 2019 visit). He determined there was no reason to order an EMG and prescribed Lyrica.

---

[11] In one instant, the date of EMG is incorrectly listed as 2/4/2015. Given the information contained in this record and another entry listing the date as 2/4/2016, this one entry is clearly a simple mistake.

### V.     Appropriate Compensation for Petitioner's Pain and Suffering

In this case, awareness of the injury is not disputed, leaving only the severity and duration of Petitioner's injury to be evaluated in calculating the pain and suffering component of damages. In performing this analysis, I have reviewed the record as a whole to include the medical records, affidavits, and all assertions made by the parties in written documents and at the expedited hearing held on February 26, 2021. I considered prior awards for pain and suffering in both SPU and non-SPU GBS cases and rely upon my experience adjudicating these cases.[12] However, I ultimately base my determination on the circumstances of this case.

I find that the severity and duration of Petitioner's GBS symptoms did not rise to the level of those suffered by the petitioners in the five cases cited by Petitioner, all of whom received $180,000.00 or close to it in pain and suffering. Although hospitalized for a longer duration than some of those individuals, Petitioner showed significant improvement during the seven months thereafter. By early March 2016 (approximately two months after her hospitalization), Petitioner was discharged from PT showing normal strength and having met all her goals. In June 2016, she described herself as 90 percent improved. He neurologist characterized her examination as normal. And there is evidence that she stopped taking Lyrica at that time.

Petitioner has argued that she continued to exhibit symptoms of GBS more than four years after her onset. Reply at 8 (citing Exhibit 24 at 9 (record from a September 6, 2019 visit to the neurologist)). However, when Petitioner first complained of these symptoms in August 2019, she dated their onset as three months before, in May 2019. Exhibit 25 at 11. She did not portray her symptoms as occurring continuously throughout 2017-18. Although she appears to deem these symptoms as a reoccurrence of her GBS, her neurologist believed them to be related to restless leg syndrome, prescribing Lyrica and declining to order an EMG.[13]

Even with her short and uncomplicated recovery, I recognize that Petitioner suffered greatly during her illness and prolonged hospitalization. As I explained previously to the parties during the expedited hearing, it is my view that GBS pain and suffering

---

[12] Statistical data for all GBS cases resolved in SPU by proffered amounts from inception through January 1, 2021 reveals the median amount awarded $167,499.14. These awards have typically ranged from $128,072.42 to $269,933.00, representing cases between the first and third quartiles.

[13] Additionally, these visits occurred more than 18 months after Petitioner filed her Petition (and several months after I determined she was entitled to compensation), suggesting somewhat that awareness of the lawsuit may have colored Petitioner's understanding of the character of her symptoms – although I do not find preponderantly that this was the case.

awards generally should be higher than other kinds of vaccine injuries that are less frightening or systemic. In this case, I find the facts and circumstances of Petitioner's case more closely resembles those experienced by a Program petitioner who was awarded $165,000.00 for his past pain and suffering. *See,* e.g., *Francesco v. Sec'y of Health & Human Servs.,* No. 18-1622V, 2020 WL 6705564, at *1, 5 (Fed. Cl. Spec. Mstr. Oct. 15, 2020). Like the Petitioner in this case, the *Francesco* petitioner experienced significant initial symptoms, hospitalization followed by inpatient rehabilitation and PT, and a good recovery in less than a year. *Id.* at *2-3.

At the expedited hearing, Respondent's counsel argued that Petitioner's circumstances were not comparable to *Francesco* because that petitioner's level of activity upon recovery was greater than that exhibited by Petitioner. For example, the *Francesco* petitioner was playing ice hockey less than a year after the onset of his symptoms. *Francesco,* 2020 WL 6705564, at *4. However, Petitioner was not as active as the *Francesco* petitioner even *before* suffering GBS, and was experiencing co-morbidities that likely had an impact on her health and activity. Thus, the argument advanced by Respondent's counsel presents a false equivalency. When Petitioner's later condition is compared to *her* prior condition, it is evident that she experienced a recovery similar to that of the *Francesco* petitioner.

In her reply brief, Petitioner also argued that Respondent was requesting that I "make a damages determination based on level of recovery alone." Reply at 7. But in determining the amount of compensation for Petitioner's past pain and suffering, I have considered the length of her inpatient hospitalization and rehabilitation and difficulties she suffered during this time, such as her difficulty with balance, need for morphine, and required catherization. And I recognize that Petitioner continued to experience symptoms following her discharge home. However, it remains the case that she made good progress during her PT, exhibiting normal strength and assessed at 85 percent during this time. By June 2016, seven months after the onset of her GBS, she described herself as 90 percent improved. Her neurologist opined that her examination was completely normal, and it appears Petitioner ceased taking even a reduced dosage of Lyrica during June 2016. Thus, I have taken into account the entire course of Petitioner's illness and recovery in identifying a fair pain and suffering award.

## VI.   Requested Compensation for Lost Wages

To support her assertion that she was forced to retire earlier than planned due to her GBS, Petitioner has emphasized difficulties with fatigue and memory that are not supported by the medical records in this case. Exhibit 20 at ¶¶ 3-4 (Petitioner's third affidavit); Exhibit 26 at ¶ 8 (Petitioner's husband's affidavit); Exhibit 27 at 2-3 (Dr. White's

letter). In fact, in her earlier affidavit, Petitioner mentions fatigue[14] only once, in conjunction with nerve pain she was experiencing in her right hands, legs, and feet as she returned to work part-time in March 2016. Exhibit 18 at ¶ 8 (Petitioner's second affidavit). In contrast, only symptoms of nerve pain in her feet, leg weakness, and difficulties with balance are mentioned multiple times throughout Petitioner's post-hospitalization medical records. And even these symptoms appear substantially resolved by June 2016.

Petitioner has acknowledged that she was able to return to work full-time in April 2016, and continued to work until her retirement in November 2017 at the age of 66. During the expedited hearing, Petitioner's counsel argued that Petitioner struggled to work in an attempt to mitigate her loss. Had there been evidence of significant ongoing symptoms and treatment in the medical records, this argument would have been more persuasive. The medical records, however, do not reflect any symptoms or difficulties related to Petitioner's GBS from June 2016 through her retirement in November 2017, and certainly not any symptoms significant enough to warrant medical treatment or prevent Petitioner from working. Accordingly, I find that insufficient evidence has been offered in this case to preponderantly support Petitioner's claim for lost wages due to an earlier retirement forced on her by a vaccine injury.

## VII. Appropriate Compensation for Petitioner's Expenses

Given Petitioner's complaints of nerve pain in her feet and difficulties with balance, I do find that the personal training sessions she attended in 2018 were undoubtedly helpful. While Petitioner suffered from obesity and vertigo prior to her GBS, the balance issues and pain in her feet were ongoing at least through 2016, or early 2017. The fact that Petitioner failed to complain of symptoms thereafter does not necessarily mean that they ceased, only that they were not substantial enough to warrant complaint or treatment. Thus, I will award the compensation Petitioner seeks for her past expenses in full.

---

[14] Most mentions of fatigue are connected to descriptions of Petitioner's total daily commute of at least three hours, a factor which would be taxing for most individuals. Petitioner's counsel countered Respondent's criticism, that Petitioner failed to mitigate her loss in this area by finding work closer to home, by emphasizing the unique nature of Petitioner's job. While I credit Petitioner's argument, I also note that Petitioner also could have found ways to reduce her commute by obtaining temporary lodging closer to work and structuring her work schedule to reduce this time. For example, when her daughter was younger, Petitioner worked at the clinic only four days a week. Exhibit 26 at ¶ 2.

9

### VIII.  Conclusion

For all of the reasons discussed above, and based on consideration of the record as a whole, **I find that $160,000.00 represents a fair and appropriate amount of compensation for Petitioner's past/actual pain and suffering.[15] I also find Petitioner is entitled to compensation in the amount of $6,281.56 for her actual unreimbursed expenses. I do not find that an award of past or future lost wages is warranted in this case.**

**Petitioner is therefore awarded the lump sum payment of $166,281.56, representing $160,000.00 for her actual pain and suffering and $6,281.56 for her actual expenses in the form of a check payable to Petitioner.** This amount represents compensation for all damages that would be available under Section 15(a).

The clerk of the court is directed to enter judgment in accordance with this decision.[16]

**IT IS SO ORDERED.**

                                              **s/Brian H. Corcoran**
                                              Brian H. Corcoran
                                              Chief Special Master

---

[15] Since this amount is being awarded for actual, rather than projected, pain and suffering, no reduction to net present value is required. *See* Section 15(f)(4)(A); *Childers v. Sec'y of Health & Human Servs.*, No. 96-0194V, 1999 WL 159844, at *1 (Fed. Cl. Spec. Mstr. Mar. 5, 1999) (citing *Youngblood v. Sec'y of Health & Human Servs.*, 32 F.3d 552 (Fed. Cir. 1994)).

[16] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.